[Civ. No. 4246.   Fourth Dist.   Oct. 23, 1951.]

ROSE M. FISKE, Respondent, v. DIRECTOR, DEPARTMENT OF PUBLIC WELFARE, COUNTY OF SAN DIEGO, etc., et al., Appellants.

Edmund G. Brown, Attorney General, Elizabeth Miller, Deputy Attorney General, James Don Keller, District Attorney, and Duane Carnes, Deputy District Attorney, for Appellants.

Hillyer & Hillyer for Respondent.

GRIFFIN, J.—Petitioner and respondent Rose M. Fiske (hereinafter referred to as petitioner) alleged that she was the natural mother of one Ronald Fiske, a minor male, born

March 13, 1948, and that on May 3, 1949, she signed a "Consent and Relinquishment for his Adoption" to respondent and appellant Director, Department of Public Welfare, County of San Diego (hereinafter referred to as respondent). She alleged that at that time it was the understanding of petitioner that the child would be returned to her if she so requested within one year from the giving and signing of the relinquishment; that during that period she made several written demands upon respondent, withdrawing her consent, and requesting its revocation, and asked for the return of the child to her; that respondent refused; that she is well able to care for the child and that it would be for his best interests that the consent be withdrawn and canceled. The respondent Director, Department of Public Welfare, County of San Diego, as well as the Director, State Department of Social Welfare answered, and alleged that a certified copy of the consent had been filed by the county welfare with the state department, in accordance with the provisions of section 224m of the Civil Code; that no notice of rescission was received and that they were not willing to join the parents in rescinding it; that petitioner was fully apprised of the binding nature of the relinquishment and that the best interests of the child would be served by permitting the relinquishment to remain in effect. A copy of the signed relinquishment, duly witnessed, is set up in the answer. It recites generally that the mother does "hereby relinquish and surrender said minor child for adoption. . . . It is fully understood by me that when this relinquishment is filed with the State Department of Social Welfare by said agency, all my rights to the custody . . . of said minor child . . . will be terminated and that said child cannot be reclaimed by me."

This agreement was signed by two witnesses and acknowledged by Miss Edmunds, authorized official of the county welfare agency. A similar relinquishment was signed by the father of the child on June 9, 1949.

After hearing, the court found that petitioner signed the relinquishment, but at the time she "was emotionally upset and physically and mentally incapable of understanding the meaning and consequences of the signing of the said document and was under the impression that the said minor child . . . would be returned to her if she so requested within one year from the giving and signing of said Relinquishment for Adoption. . . . That the petitioner did not give real consent at the time of signing said Relinquishment. . . . That shortly before

the time of signing the said document, to wit, May 3, 1949, the Petitioner had been divorced by her husband . . . and she was unable to support herself or her three minor children and was greatly distraught by her financial difficulties. . . . That before said Relinquishment . . . had been filed with the State Department of Social Welfare, Petitioner made a written request and demand on June 6, 1949, that her child . . . be returned to her''; that petitioner was able to care for and educate the minor child; that respondents unreasonably refused and still refuse to revoke, cancel and annul the relinquishment for adoption; that the child has been in the custody of the department for 17 months and has not been adopted; that there is no reason given by the department why said agencies are unwilling to join in the cancellation of the relinquishment; that it is not shown that the best interests of the minor child would be served by the permitting of the relinquishment for adoption to remain in effect; that petitioner is a fit and proper person for the care, custody and control of her child; and that it is for the best interests and welfare of the child that the relinquishment be canceled.

The judgment was that the relinquishment was not a valid one and that it should be and was ordered canceled and declared void and the child ordered delivered to petitioner. Respondents appeal and contend that the evidence is insufficient to support the finding, and that the findings are not responsive to any issue raised by the pleadings.

Petitioner lived in San Diego, had three small children. Ronald was the youngest. She divorced her husband. She was destitute, and went to the Welfare Department for aid and advice. According to her testimony, she contacted a Mr. Bartley. He advised her not to adopt the baby out but to keep the three boys togther. On May 2, she talked to a Miss Edmunds in that department, about relinquishing the child for adoption and she advised petitioner that it would be the best thing to do. The child was then with the "Weber" family by arrangements with petitioner. On May 3, she stated she went to the department and Miss Edmunds, who had some papers with her concerning relinquishment, read them to her and she asked petitioner if she was ready to sign the final papers and that petitioner said "Yes" and that she signed the relinquishment and that the witnesses, as indicated, also signed it; that before she signed it she discussed with Miss Edmunds the effect of the relinquishment and that Miss Ed-

munds told her "my signing the paper didn't mean it was final" and said "within a year after the date I signed it that I would get my baby"; that "within one year, it would be final." She testified that she was born in New York and that she knew under the laws of New York she could "get her baby back during one year." No motion was made to strike this last statement, but after it had been stated, an objection was made and sustained. She then testified that just prior to signing the relinquishment she told Miss Edmunds she was going back to her mother in New York and that the welfare worker told her "Well, after I got home to the other children, if I was, you know, if I got a good job and got settled in my home, and I knew if I had a better plan for Ronnie, that I could take care of him, I could get my baby . . ." provided she did it within a year; that she left on May 10, with the other two boys, with money she obtained from her mother; that on June 6th she wrote to Miss Edmunds and inquired (letter in evidence) about Ronald, asked if she had found suitable parents for him, if there was a possibility of her ex-husband getting him, and wanted to know: "Is it too late for me to ever get him?" On June 15, 1949, Miss Edmunds replied, stated that Mr. Fiske had signed the final relinquishment and could not get the baby. She told her that the department had several good homes in mind for placement and wanted to know: "Are you in any real doubt as to whether this will be the best plan for him? The final papers have gone through, of course, but you will recall that we do not like to complete plans for adoption unless you are very sure that it is the best plan available for the baby. If you felt that after all you had some suitable plan for Ronnie yourself—and were in San Diego—we would be happy to talk it over with you. Since I cannot discuss it with you—and if you do have some plan in mind which you think would be better than adoption for Ronnie—we would want you to talk it over with a social worker in your vicinity. Will you let me know how you feel about this. Then, if you have some other arrangement in mind for Ronnie, I can have a social worker in your area get in touch with you about it; or, if you think adoption will be best, I can go ahead with that plan. . . ."

On June 25, petitioner wrote and stated that she saw a social worker in New York and "She thought it was best to do the right thing for Ronnie's sake. I'm sure he will have a better future than I can give him. . . . I want him to be loved by a good loving mother and father. . . . Yes, you can go ahead with the adoption, because it's the only way out. . . .

I am so depressed and disgusted about my unhappy life that I don't know what I'm going to do now."

On July 3d Miss Edmunds wrote petitioner a most comforting letter and assured her that when Ronnie was adopted he would have a good home and loving parents. On July 11th, petitioner then wrote to Miss Edmunds and stated that she had gone through so much trouble, had a nervous breakdown, and had finally come to her senses and decided she could not give Ronnie up; that she had been crazy and could not go on without him; that she realized she signed those papers but she was under great strain; that she then only thought of the present and not the future; that the fact that her husband left her alone, as he did, and finally deserted her, left her without her right mind, that she was going to the social worker in New York and explain and that she hoped she would get Ronnie back home soon; that she would come to California and get him in July. She implored Miss Edmunds to help her obtain the baby. On July 15th, respondent director wired petitioner that the agency would have to get in touch with the social worker in New York before it would consider any change in plans for Ronnie. On September 12th, Miss Edmunds advised petitioner she had been in touch with the New York social worker and advised petitioner that ''once the final relinquishment papers are signed by the parents, they can no longer have the child returned to them,'' and gave the reasons for the actions of the welfare department and suggested that petitioner see the New York social worker for further explanation.

Petitioner then testified that the reason she signed the relinquishment was because her husband had deserted her and the three children, without sufficient money to pay the bills and she did not have enough money to feed them; that she placed Ronnie with the Webers before she went to the welfare department and discussed with them about adopting him, but they decided not to continue with such a plan.

Petitioner's mother testified that when petitioner arrived in New York with her two boys she was ''upset'' and ''confused.'' At the hearing petitioner called the welfare workers and witnesses to the instrument as her witnesses, who testified generally that they told petitioner, when she signed the relinquishment, that it would not be complete until her husband had also signed it and it was filed with the State Department of Social Welfare, after which it was final and binding and the child could not be returned to petitioner except by rescission of

the relinquishment by mutual consent. They further testified that petitioner read the relinquishment and that it was fully explained to her. Respondents called a welfare worker who testified that petitioner saw her on April 6, 1949, and on several occasions thereafter talked to her regarding the independent adoption of the boy by the Webers; that she would not encourage petitioner to sign the relinquishment until she had investigated it; that the Webers did not care to proceed with the adoption; that petitioner was pretty upset over this fact and wanted the department to work out a plan for her child; that she told petitioner if she would sign a "consent," the department would take the child from the Webers and accept him "for study"; that this "consent" provided it was not a final consent or relinquishment but a preliminary step toward an agency adoption; that the agency or the mother "may go back on it" and it was so explained to petitioner. After securing this "consent" petitioner and the child were referred to Miss Edmunds.

The signed relinquishment here involved was sent to the Department of Social Welfare in Sacramento on June 9th, and filed there on June 13th, 1949. This proceeding was commenced on May 24, 1950, and it was agreed that the child, up to the time of trial, had not been placed in an adoptive home.

The complaint is (1) that the finding that petitioner was, at the time she signed the relinquishment, emotionally upset and physically and mentally incapable of understanding the meaning and consequences of her act, is not supported by the evidence, nor within the issues presented by the pleadings; (2) that the finding that petitioner did not "give real consent" is not supported by the evidence; (3) that the finding that petitioner made a written demand for the child by letter on June 6th before the relinquishment was filed with the State Department of Social Welfare is not supported by and is contrary to the evidence. It is further contended, in this connection, that since section 224m Civil Code provides that when such a relinquishment authorized by that section is filed with the State Department of Social Welfare it may be rescinded only by the mutual consent of the parties, that, as a matter of law, petitioner had no right to rescind the relinquishment by the method pursued. As we construe it, respondents argue that before the court would be justified in canceling the relinquishment, the petitioner must show that it was obtained by duress, menace, fraud, undue influence, misrepre-

sentation or mistake and that since there was no evidence nor finding of any such ground other than the possible ground of mistake, the mistake relied upon for a rescission was only as to a collateral matter and not sufficient to support the finding that "petitioner did not give real consent at the time of signing." The same argument is made as to the finding that the petitioner was "emotionally upset and physically and mentally incapable of understanding the meaning and consequences of the signing."

There is some evidence in the record bearing upon these subjects. Petitioner testified that one social worker told her before she signed the relinquishment that it was not final and that within one year after she signed it she could get her baby back. This testimony is refuted by the welfare worker. There is further testimony that in a previous interview with another social worker in reference to an independent adoption proceeding, the welfare worker told petitioner that if she signed a "custody consent" it would not be binding upon her and could be revoked by her at any time. The trial court had the right to believe the testimony of petitioner on this subject. There is some indication in the letters that petitioner did suggest the return of the child within one year. The trial court was justified in finding that a misrepresentation of fact was made to petitioner in this respect and that petitioner was mistakenly led to believe that she had one year within which to act. There is substantial evidence opposed to this conclusion that might well have supported a contrary finding. The question of the weight of the evidence was for the trial court and this court may not interfere with its finding and judgment unless a clear abuse of discretion appears. (*Chichester* v. *Seymour*, 28 Cal.App.2d 696 [83 P.2d 301].) In view of this determination no further discussion of the additional points raised is necessary.

Order affirmed.

Barnard, P. J., concurred.